Hear ye, hear ye, this Honorable Appellate Court of the 2nd Judicial District is now back in session. The Honorable Mary S. Shostak, presiding. Good morning. You can sit down. Oh, did I sit down? You picked a garbage can. It's too early to pick a can, Mary. Okay. You can call the case. Go ahead. Your Honor, the third case in the docket this morning is 2-22-0455. Mary Ann and Axel Conrad, plaintiff's appellate, v. Valley Imaging Consultants, LLC, defendant's appellate. Argument on behalf of the appellate, Mr. Peter B. Hogan. On behalf of the appellate, Ms. Kimberly A. Jensen. Thank you. Welcome. Thank you, Your Honor. Mr. Hoste, are you ready to proceed? Yes, Your Honor. You may approach. Okay. Good morning, Your Honors. Counsel. And may it please the Court, my name is Peter Hoste, and I'm here on behalf of the appellants, Andrea and Axel Conrad. Your Honors, this is a case in which the private practice radiology group, Valley Imaging Consultants, obtained a summary judgment order by arguing that their radiologist, Dr. Judge, who they hired and who they paid was not its agent as a matter of law. Under the law, the issue of agency is always a question of fact. Summary judgment should only be granted where the evidence is uncontroverted, where the party's relationship is undisputed. Actually, the language in the opinions is unless the evidence overwhelmingly establishes that it was an independent contractor, correct? That's some of the language in some of the cases, yes. Here, he was paid a wage, hourly, right? Correct. Hourly wage. He kind of set his own schedule by agreement with Valley Imaging? Well, I... Okay, I'll just go through a few things that tend to support that he was an independent contractor. He could not be obligated to work a shift. It was always by agreement. He couldn't be told you have to be here. Those things all tend to support the argument that he was an independent contractor. There are certain things that suggest he was an independent contractor. For example, they didn't withhold Social Security or federal income taxes, things like that. As opposed to W-2, et cetera. Correct. But the scheduling is important because it's not like I hire a painter to come paint my house, and on Monday he comes in, he's there at 9, and he cuts out at noon, and the next day he shows up at 2 and goes home at 4 because that works for his schedule. You must use my painter. What's that? We had a flood and we're painting right now, so that is... Well, Valley Imaging argues that they really had no control over his work. Okay, that's what they argue. Yes. His methods. How do you refute that argument? Well, simply there's... First of all, we have a contract, which is very important here. But in terms of going back to the schedule, he couldn't determine his own schedule. They offered him certain shifts, and then he either agreed to take those shifts or he declined to take those shifts. But once he accepted a shift, he had to fill it. And if he couldn't fill it, if he agreed a month and a half to do a shift and then something came up and he couldn't fill it, he would have to get his own coverage for that shift. In some circumstances, he would call the supervisor, the head guy, to cover for him, right? Were there different circumstances? Correct. He said if he was on vacation, he had to get someone to cover? Right. So he was covering shifts for their regular employees that were either on vacation or out at conferences or something. And they had moonlighters, part-time employees, that they would hire to come in and fill shifts from time to time. I think his testimony was that in the years leading up to he'd done this for years for Valley Imaging, and in the years leading up to Mrs. Conrad's episode, he was doing it three or four times a month. So this wasn't an issue where he could, you know, sure, he picked the shifts he accepted, but the offering of those shifts was solely up to Valley Imaging. He couldn't say, I'm free next Tuesday. I want to go do a shift for you, right? That had to be offered to him, and they had to need the coverage. And that's how they filled that. But going back to your question, Justice Burkett, the things that they argue support an independent contractor relationship, well, there's a whole lot else that supports an agency or employment situation, including some of the things we're talking about. The contract itself says that he's there, he has to work for Valley Imaging at Rush Copley as the group shall direct. I mean, direction and control are synonyms. I think I cited my father's old blacks law dictionary from 1952 or something like that. But, I mean, those are clear synonyms. The contract also says he can only work at Rush Copley as permitted by the group, right? That's a clear indication of control in this context. What about the no solicitation, non-compete clause? That's absolute control. Which way does that go? Well, that's in favor of an agency relationship. I mean, if you're controlling not only what he does here, but what he does outside of this. Correct. And he had to sign an agreement stating that he gives up his privileges to work at the hospital if his relationship with Valley Imaging is severed. This is not a situation like some of the cases that are cited by the defendant here, where it's a hospital, and those hospital cases, which I really hate the term red herring because it's a little trite sometimes, but it's a true red herring because when the plaintiff tries to hold a hospital liable for these things, the language always comes back, no, the hospital gave privileges to the doctor to treat his or her own patients at the hospital. How many of these part-time employees or people that hold themselves out to be independent contractors did Valley Imaging have? Does the record show that? There were other ones. So several, I think, was the word in the deposition of Dr. Judge. And how many full-time positions do they have, radiologists? I can't remember exactly. I think it's eight to ten, something like that. I mean, they had a responsibility to provide coverage 24 hours a day, seven days a week, and it was in the hospital during normal business hours, but they could do it remotely after hours and on weekends and things like that. Even on weekends, actually, during the day, there had to be a radiologist present, and that's pursuant to the contract between Valley Imaging and Rush Copper. The radiology department was the radiology department of Rush Copper, correct? Correct. The radiology department of Rush Copper was Valley Imaging. They had the exclusive right to provide radiology services at Rush Copper. Exclusive right meaning? Physician services. To provide radiology services. So non-Valley Imaging radiologists could not practice there. Could not get privileges there and could not work there, period. If you were a radiologist and you were at Rush Copper, you were there only by way of your agreement with Valley Imaging, right? So, you know, the other, I think, argument that the defendant makes in this case that really needs some clarification, I think, is the use of the term independent medical judgment. Consistent with the methods of the imaging in Rush Copper, right? Well, in terms of the element of control, because there's some cases out there that say, no, the hospital, in these hospital cases, which are totally different from this, right? There's a lot of cases that say the doctor used his or her independent medical judgment and did not have to call the hospital and ask for permission every time they made a diagnosis or something. So it's interesting because I took the deposition of Dr. Judge. I asked him in his deposition after counsel asked, well, did Valley Imaging tell you how to practice medicine? His answer, of course, was no, they didn't tell me how to practice medicine. They told me what shift I was working, but I used my own independent medical judgment. And so I asked him, okay, you have a full-time employer, which is radiology and imaging, RIC. It's a different... I think he said he spent 80% of his time working for that. His full-time employer, yeah. So, and I would agree with that, but I said, well, do you use your independent medical judgment when you're providing radiology services for your full-time employer? He says, of course. I said, well, do you do it the exact same way you do when you're doing it for Valley Imaging? He says, yeah. And that makes sense, of course, right? As lawyers, we use our independent legal judgment. You know, in your argument, in your brief, you talk about the engagement agreement and that Dr. Judge was to perform in accordance with policies and procedures of Valley Imaging. With Rush Copley, according to policies and procedures of Rush Copley and... And Valley Imaging. Right. So he testified that there are no written policies and procedures. Yeah. That's his deposition. Right. So how does that support your argument that he is an employee? Sure. So he's... First of all, what he says in his deposition... I've been doing this for a long time. I've taken a lot of depositions of a lot of doctors. I don't know if there are policies and procedures for Valley Imaging or not. I do know there's policies and procedures for the Rush Copley Radiology Department, which Valley Imaging runs. But whether or not there are specific policies or procedures from Valley Imaging, I don't think is really important, other than I think if we looked at the contract between Valley Imaging and Dr. Judge, it sets forth what he's required to do and follow in terms of that stuff. He's got to provide services as the group shall direct. He can't provide services because of these restricted covenants at other places. He can't provide services at Rush Copley outside of his work for Valley Imaging. He can't even associate with other physicians from Valley Imaging for a period of three years after the contract should end. He can't associate himself with any of the other physicians there. He can't solicit patients that he met through Rush Copley. And that's because they don't want him to come in there and learn about how their contracts work and how Rush Copley works. And then when Rush Copley's contract with Valley Imaging is up, to form a competing group and try to compete with them. We're talking control. We're talking control. Let's talk about some of the other issues that you are submitting lend us towards an agency relationship, like the nature of the work performed, the skill involved, question of hire and right to discharge, et cetera. Sure. So ending where you left off, the hiring, it's clear they hired him and they employed him to work there and they had a right to discharge him. There were certain circumstances where they could remove him immediately if they didn't think he was providing services safely. Say if Rush Copley complained about him. I'm sorry? Or if Rush Copley complained. Or if Rush Copley complained. Then he was gone. But Rush Copley couldn't remove him. Right. Only Valley Imaging could. So they hired and they could fire him. The method of payment was hourly. I think we've discussed that. The defendant tries to say, oh, well, because the shifts are distinct periods of time, that's on a per job basis. I would disagree with that. If I hire somebody hourly, it means they come in and they work hourly and I pay them by the hour. That's how he was paid. If his shift was 10 hours, he'd get paid his wage times 10 hours. But does the payment really have that big of an impact on agency versus not agency? Because a lot of people are paid by the hour. Right. They're not agents. I agree with you. But that is a thing. That's why we have to look at all these different elements. We don't just look at one thing or another. You have to take in all the different elements and that element. Some elements have more weight than others. Correct. So is that a lesser? Is that a headline? In my brief, it's not. But it's there. It's certainly in favor of the finding of agency. How about the condition or the benefit of having his medical malpractice insurance paid for? That's huge. That's huge. Is that common in the industry? Is it common in the industry for an employer to provide malpractice insurance for his employee? Absolutely. Absolutely. And so there's a dispute about whether they actually provided that to him. But they did have an obligation to provide it. And so as a practical matter, Mrs. Conrad's, she goes to Rush Copley. Dr. Judge failed to make a diagnosis that the neighbor actually made at home. A few days later, probably saved her life. And she has, because of this delay, she has these neurological problems that are going to take years. She's going to have lifelong problems. So as a practical matter, she should have had insurance coverage from Dr. Judge's own policy that she had through Valley Imaging, who's the principal or the employer, and then through the policy that Valley Imaging had an obligation to provide to Dr. Judge under their contract. Now, they hadn't disclosed that policy. You saw some reference in the trial court evidence, I'm sure, on that. And now they've gotten out on summary judgment. So Mrs. Conrad's, who's been devastated by these neurological injuries, has gone down from three policies to one policy. Well, speaking of the malpractice insurance policy, yeah, I'm sure that's important. But he was receiving no other benefits from them. Correct. Correct. Just like a part-time employee, right? So I obviously heard the beep. Hold on one second. Do you have any other questions? Any questions? You can wrap up. And, Judge, you asked the other question, which I do want to just address briefly. We were talking about these other factors. Right. And you talked about the commonality of the business, I think. You didn't use those words. But the fact that radiology— The type of work. The type of work. Valley Imaging, their job, their full purpose is to provide radiologists at Rush Copley. And they hire Dr. Judge, a radiologist, to provide services at Rush Copley. His name is Samuel. They're regular employees. Correct. Correct. And that's a big factor. And is that where some of the case law looks at the skill of the work that is involved? I think so. And I think that's another factor. There's the—I call it the car case because it was the auto dealership case, Bob, Neal, Pontiac or something, where their car dealership, they hired a painter to do part-time work. And they paid him hourly. And they said, even here, I know painting the dealership is different than selling cars, but even here, you know, he's an agent. This is clear. I mean, it can't be clearer. Their group provides radiology coverage, and they hire a radiologist. It's—my old favorite joke, we call that a cow case. It's on all fours. So that's what we have here. Thank you. Thank you. Well, we've covered a lot about painters today. So we'll get back, and you'll have your opportunity for rebuttal. Thank you. Okay. Ms. Jansen. Good morning. May it please the Court. Kim Jansen on behalf of Valley Imaging. So the evidence in this case, the facts are undisputed. Nobody disagrees about the actual historical facts. The question is whether those facts are sufficient to support an inference of agency or employment. Well, ordinarily, the question of whether or not a person is an employee or agent is a question of fact. And here, you know, is this an appropriate case for summary judgment when there are—even the trial court admitted that there's— that counsel made a fair argument. You know, you've got two views, two competing views, and the trial court should not resolve a case on summary judgment when the facts are subject to two different interpretations. Correct? That is correct as a legal principle. That is not correct as applicable to this case. Why not? Well, as you implied earlier in the counsel's argument, the evidence here is overwhelming. The trial judge's comment about, you know, that's a fair point, wasn't—you have a fair argument that this could go either way in terms of all of the facts. It was really just to that one contract interpretation issue. The contract's a big—it's a big part of this case. The interpretation of the contract is a question of law. That's not—that's not a question of fact. And it's—the judge did determine that. And I think it's clear, the plain language of it as well, that, you know, that sentence that says, as the group shall direct doesn't say that the family imaging retains a right to direct the method and manner of how Dr. Judge carries out his work. Well, they do—they do—they do say, okay, you're going to go in this radiology room. You can't leave from these hours. You know, he has to go to the cafeteria. He has to tell someone where he is. I mean, is—I mean, they are telling him a lot what to do. They're telling him he can't hold himself out as an employee of Valley Imaging and—or hold himself out as an employee of Valley Imaging. But under the agreement, they are very much controlling of his time and how he functions as a radiologist, especially. I disagree. First, they cannot control when or even if he accepts a shift. They offer shifts, and then he can pick and choose which ones he wants to take, if he wants to take any of them. And if he can't perform, he has to find somebody else to fill that spot? After he's accepted one. And that's—that was part of his testimony, that that's an expectation. There's nothing in the contract that specifies that, but I think that's, you know, just normal professionalism. How is his work any different than the regular doctors who work for Valley Imaging? I mean, aren't they fungible? I mean, it's the same work, identical, you know, in terms of working his shift. It's the same work, right? The services provided, presumably, are the same. The difference is—so it's like in Wheaton v. Suami. The court said, just because they don't control every aspect of medical decision-making doesn't mean there's no relationship. And then they went through all the different types of control. The doctor in that case had, you know, fixed hours, five days a week, nine to five. Had to live within a certain radius. Had to be accessible by cell phone or beeper, etc., etc., etc. And while we don't have evidence specific to Valley Imaging's, you know, primary, their employees, their regular full-time employees, presumably, as employees, they have fixed schedules. They have expected hours. If Valley Imaging says, you know, you're scheduled to work this week, they don't have the luxury to say, nah, I kind of wanted to go golfing that week, or I had a family vacation planned. But he still had to abide by their working terms, did he not? I mean, in the agreement, he really had to abide by a lot of the terms of the working. Medical staff membership and clinical privileges terminate automatically in the event his employment, engagement, or affiliation terminates for any reason. Second, the engagement agreement mandated he waive any rights to a hearing, to review, or due process that he might be entitled to in connection with his termination. Those are elements required by Rush's contract with Valley Imaging. That, so, the physicians, whether employees, the special power of attorney that he had to grant them, that was all required by the Rush contract. Correct. And if he got up and left during his shift and just went somewhere, Valley Imaging would be in breach of their contract with Rush Copley, correct? Yeah, I believe so. So, his work was controlled in terms of what he was doing. He could not leave. He couldn't leave Rush Copley. He couldn't even leave the screening room. But that's the service he's contracted to provide, is to be there for a shift. So, your argument is because it's the contract, it's not controlled. Well, so, let's go back to one of Mr. Hosey's painters. If he hires them to paint his dining room, and they paint one wall and half of a second wall, and then decide to just up and leave, you know, they've breached their contract. They've lost Mr. Hosey in quite a predicament. But they're still independent contractors. Well, how about the no solicitation, non-compete section? So, yeah, the no solicitation, non-compete, as well as the exclusivity of Valley Imaging's service relationship with Rush, that doesn't control the method and manner of Dr. Judge's work at Rush Copley. So that's what it does directly. It prevents him from competing. It controls his work outside. It controls who and where he can work outside of his work. But who's that benefiting if they're controlling that? It's benefiting Rush Copley and the imaging. Sure, I mean, non-compete agreements are pretty common, but particularly in fields like medicine, there's nothing that indicates that independent contractors can't be subjected to non-compete agreements. Whether he's their employee or an independent contractor, they have an interest in making sure that when he acquires knowledge of their relationships and different things that would help him compete for business, that they're not going to put him in a position to undercut them and come take over their business. How many full-time radiologists does Valley Imaging have? I do not know the answer to that question. I'm sorry. Wouldn't that be an important question in terms of whether or not, how he differs from the regular staff? For example, say we have three or four full-time doctors, and then we have ten independent contractors. I mean, we don't know that. No, but I don't think that that affects whether he is or isn't an independent contractor. If he's performing the work that Valley Imaging provides through their regular doctors, and the work is no different, and he agrees to abide by the policies and practices of Valley Imaging, as well as Rush Copley, how does that affect our analysis? Well, as far as policies and procedures, Mr. Hooks, you haven't pointed to any specific. It says that. It refers to a regulatory compliance policy. That's controlled, is it not? No. In Hammer v. Tharpe, the court said that these administrative regulations, things dealing with administrative compliance. We don't know what they actually are because they're not in the record, but they are in the engagement agreement, right? Right, but we do know what they are. They're regulatory compliance and confidentiality policies. We don't know all the specific terms of it, but we know the character, the nature of the policy. In evaluating whether or not there's a genuine issue of material fact, we construe the pleadings and the evidence strictly against Rush Copley, or against Valley Imaging, correct? The evidence is weighed in most strongly in favor, but you don't infer evidence exists that there's no indication that it does. I'm sorry, what was that? Yeah, let me see if I can try and articulate that more clearly. In construing the evidence most strongly in favor of the non-moving party, we don't imagine a body of evidence that could theoretically maybe exist out there. The trial court's decision has to be clear and free from doubt. Correct. And your argument is free from doubt, despite all these questions we've asked about control of the non-compete clause, non-solicitation clause. None of that affects his status as an employee or agent of Valley Imaging? None of those amount to control over the method or manner of his work. Well, every doctor has to abide by the Hippocratic Oath, apply with the statutes that are on point, disclosure issues, HIPAA. That applies to every single doctor. Correct. So, you know, even in a hospital, the hospital does not necessarily control a doctor's decision-making with regard to a diagnosis or a treatment plan. Correct. And the same would probably be true of Dr. Judge, right? Conferring with people at Valley Imaging? That they would. I'm sorry. Does anybody review his work at Valley Imaging? I know that his name is not on the invoices. It's Valley Imaging that's on the invoices. He doesn't even appear on the invoices, right? Right. So Valley Imaging is saying, this is our product. It's not the product of Dr. Judge. This is Valley Imaging's product. Right, because under Valley Imaging's contract with Rush, they're responsible for providing the service. They do so by providing services through their employees and where they need to fill gaps through independent contractors like Dr. Judge. Dr. Judge doesn't bill for patients because if his work were contingent on how many charts he wrote during a particular shift, it would be a lot less certain. For him, he's working a single discrete shift as available, when he's available. He knows when he leaves in the morning, how long he's going to be there, and what he's going to get paid. And he reports to ACBAR. And when he receives emails or sends emails, he sends them to Dr. ACBAR, right? Who's the president of Valley Imaging. The president of Valley Imaging, but he is also the medical director for the Department of Radiology. And I will correct Mr. Hosea with respect to the representation that the Department of Radiology is Valley Imaging. I don't think that's accurate. Valley Imaging provides the physicians, the radiologists who staff the Department of Radiology. Rush hopefully provides everything else. The tools. The tools, the non-medical staff, the space, the material, the supplies. Valley Imaging simply provides the services. And they do so through both employees and independent contractors. One question about the insurance coverage. I mean, it seems that that's not a common benefit of an independent contractor. What do you have to say about that? That's a provision in compliance with the Rush-Copley contract. So Valley Imaging is obligated under its contract with Rush-Copley to provide insurance for all of the physicians it provides. I don't know that there's any evidence that that's not done in independent contractor situations. Is that not a factor indicating employment as opposed to independent? I don't believe it is. The cases that have been cited, Pantaleo and Oliviera, talked about evidence of insurance in terms of its admissibility. Saying that evidence of insurance, despite the normal prohibition against it, it may be admissible to prove things like agency and various other things. Nothing in either of those cases suggests that insurance in and of itself is a factor, is relevant, is somehow an indicia of agency. It's not in and of itself. But, you know, as Mr. Hosie said, if you look at all of these factors together, it certainly has some weight, does it not? I disagree. I don't, I don't. Well, you're not going to agree. One other thing, Ms. Jansen, I'm only kidding you. You keep saying, oh, that's because it's in accordance with Rush-Copley. The engagement agreement talks about providing professional medical services not just in accordance with Rush-Copley's policy, but also, they say, and I quote, in accordance with the policies and procedures of Valley Imaging. So this agreement, engagement agreement, talks about policies and procedures, not only Rush-Copley, but of Valley Imaging. But again, there's no evidence that those are policies and procedures related to the method and manner of work. And again, Hammer v. Barth says, when you're talking about administrative policies and procedures, you know, what form you use or whatever, other administrative type things, that's not an indicia of an employment or agency relationship. You know, you can keep going. We've been asking you a lot of questions. Ms. Josie, I don't think you mind if we give her a few more minutes to get some of these issues. I don't mind. Okay. If I may, just one other point on the insurance issue. Including it in the contract, in my mind, is more of an indicia of an independent contractor relationship. Because when somebody's an employee, they would presumably already be covered under Valley Imaging's insurance policy. Valley Imaging would have a policy in place that covers its employees and agents. So the fact that they would need to provide it separately for Dr. Judge suggests that he's not the same. When Dr. Judge was working the shift, he was required to review all stat exams. He didn't have a choice on what to read or what to look at, correct? He was required to look at everything that came his way. That's the project. That's painful living. And he had to fill out forms. I don't know how. Document what he is doing and his diagnosis. I presume he does, but I don't know that there's any evidence of any specific requirements regarding how he charts, when he charts, where he charts. Just one final question. Given this discussion on the various factors that may weigh in favor or not, even if they weigh strongly in your favor, are these not questions of fact that are not for the judges but for the finder of fact? So, again, if the evidence is overwhelming, if only one inference can be drawn from the undisputed facts, then it becomes a question of law. And I would submit that that is the case here. We're talking no evidence of control, no right to discharge at will, contrary to what Mr. Hoste argued. He's paid out of 1099, not a W-2. No benefits, no tax withholding. Yeah, I think we've covered. What about the furnishing of all the equipment? Rush Coakley furnishes all the equipment, not Bell Imaging. They furnish all the equipment for Bell Imaging stockers as well. Yeah. So everybody gets. They provide everything. So it doesn't really go one way or the other. Yeah, they included everything for the Department of Radiology. Bell Imaging provided the services. Do you want to wrap up? If there are no further questions, I would simply ask that you affirm the track work. Okay. Thank you very much. Thank you. Mr. Hoste, your rebuttal. Very briefly, Your Honors. Just on that last point in terms of the equipment that's provided, there's two contracts here. The first is Bell Imaging's contract with Rush Coakley. Rush Coakley agrees to provide Bell Imaging with the office space, the equipment, the machinery, everything they need, and the non-physician personnel. They provide that to Bell Imaging. They don't provide that to Dr. Judge. They provide that to Bell Imaging. Bell Imaging then provides that or allows Dr. Judge to utilize that, which is a necessity for him to do his work when he's filling a shift for Bell Imaging at Rush Coakley. So Rush Coakley isn't providing anything directly to Dr. Judge, and I think that's an important distinction. What about the length of the contract and renewing the contract? How does that affect our decision as to whether or not he's an employee? His services have a fixed time period, right? It was a one-year contract that renewed automatically unless somebody decided they didn't want it. And I think this was on his fourth year, something like that, of his contract. In fact, at the time of his deposition, which is even years later, he was still doing shifts for Bell Imaging. Can I ask you a question if you know the answer to this? You might not. But does Rush Coakley join with Bell Imaging in determining whether or not to hire these radiologists? No. It's all up to Bell Imaging. It's all up to Bell Imaging. So Bell Imaging hires the radiologist. The radiologist has to get privileges to practice at Rush Coakley, which is facilitated pursuant to the contract. Pursuant to the agreement. Pursuant to the agreement. And if for some reason Rush Coakley decides they don't want Dr. Judge or any other radiologist working there, they can't remove him. They have to talk to Bell Imaging and have Bell Imaging remove him. And I think that's an important distinction. Importantly in a case like this, I know you had an agency case before that I just heard, and there were some elements. It's very different. But when we talk about agency law and the concept of respondeat superior, as I was coming out here today, I was thinking, why are these principles under the law? And I think there's three reasons. It's one, to protect the public. Right? To make sure that the principal is held accountable for actions of an agent that is providing services for and on behalf of the principal. Right? You want to make sure the public is protected, that there's somebody behind it, the person it's benefiting from. In this case, that's Bell Imaging. The second is to protect the agent. The agent here is Dr. Judge. Meaning when he's there providing services for somebody else, in this case Bell Imaging, and Bell Imaging is profiting off of that, that he's not there, to use a non-legal term, left holding the bag on his own. Right? He's got something behind him in case something like this happens. And the third is to protect the principal. Right? For those situations where there's truly an independent person working for that house painter, for, you know, I keep going back to painting and clearly bringing my home life here. But, you know, for those situations where you have a truly independent person, and then you protect the principal. And so you have these three different ways to think about it. But when we look at this, you know, and I go back to the issue with, say, I think it was Justice Burkett asked about who billed the patient. Well, you know, let's follow the money. They pay Dr. Judge by the hour. But they bill the patients directly. And they reap the rewards from that. And then, you know, when we go back to protecting the public, protecting the agent, protecting the principal, we're following the money as well. So I know that's not a principle that was set forth in any of the agency law cases we talked about, but I think that's the overarching reason behind why we have respondeat superior in the first place. How do you respond to the argument that the language in the engagement agreement, that Dr. Judge has followed their policies and practices, referred only to administrative acts? Well, I think it depends on how you define administrative. But it's, to me, the critical distinction is, and if we look at the cases where it distinguishes, because I think Hammer v. Barth was the one that counsel brought up, the distinction between Hammer v. Barth, which was a hospital case where a doctor who was not being paid by the hospital, the hospital wasn't billing for Dr. Barth, the hospital, I think it was Christ Hospital, was allowing Dr. Barth to provide services at the hospital because he was on staff at the hospital. Dr. Barth had his own private practice group, which I think was CSL, Cardiovascular Surgeons Limited, or something like that. That's who his principal was. And that was an easy case for the appellate court in that situation, I think, because those administrative things were just that, administrative. Here we have much more than administrative stuff, meaning, oh, you have to get privileges and you have to make sure that you look clean and presentable. It was, oh, you can't work at Rush Copley without us. You can't solicit people at Rush Copley at all. And if you're not going to work during the time you're working for us and for a period of three years after, you can't even practice radiology within three miles around any facility that Valiant Imaging provides services. That's well beyond, you know, run-of-the-mill administrative stuff. So that's how I would distinguish that. But I would say none of the, there's no case where, and there's never going to be a case, where somebody would say, and the Wheaton Court recognized this, where somebody's going to say, this is how you have to practice medicine, you know. Read the film and then call your boss and ask if that's okay. That's never going to happen, and that's the reality of medicine, and a lot of other professions, frankly. Gentlemen, thank you very much. Thank you very much. Thank you very much, Mr. Holstein, Ms. Jansen, for your time here today. We will take the case under consideration and render a decision in due course.